IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

FREDERICK JACKSON,

        Plaintiff,

v.

CITY OF MADISON, JACOB CONRAD, JOSEPH
WEBERPAL, RENE GONZALEZ, JAMES IMOEHL,
MITCHELL WITT, and JAVIER LOREDO,

        Defendants.

OPINION and ORDER

22-cv-689-jdp

---

This case arises from plaintiff Frederick Jackson's arrest in the wee hours of the morning on December 14, 2019. At around 7:30 pm on the evening of December 13, a neighbor reported hearing a gunshot shortly after Jackson had come to his house to ask for a ride. Officers from the Madison Police Department were dispatched to the scene, where multiple officers heard additional gunshots and saw a male figure that turned out to be Jackson go into what the officers knew to be Jackson's house. Approximately five hours passed before Jackson came out where the officers could see him. Jackson was unarmed and wearing only boxer shorts when he appeared, but he did not immediately comply with the officers' instructions. Defendants Joseph Weberpal and Rene Gonzalez used baton launchers to shoot Jackson with a total of three 40 millimeter rounds made of foam and plastic, which are considered a less lethal weapon than normal bullets.

Jackson brought this case under 42 U.S.C. § 1983, contending that the defendants violated his Fourth Amendment rights in various ways.[1] Specifically, Jackson contends that

---

[1] Jackson's complaint names Blue Cross Blue Shield as a subrogated plaintiff pursuant to

Weberpal and Gonzalez's use of the 40 millimeter rounds at defendant Javier Loredo's direction violated his Fourth Amendment right to be free of excessive force. Jackson also contends that the three other officers, Jacob Conrad, James Imohel, and Mitchell Witt, used excessive force when handcuffing him. Jackson also asserts claims for unlawful arrest, failure to intervene, and municipal liability against the City of Madison.

Defendants move for summary judgment on all Jackson's claims. Dkt. 18. In considering defendants' motions, the court must view the evidence in the light most favorable to plaintiff. But even with this perspective, the undisputed facts establish that defendants did not violate the Fourth Amendment by entering Jackson's house without a warrant, breaking the windows of the house, or using physical force when handcuffing Jackson. As for Jackson's claims concerning the use of 40 millimeter rounds, defendants are entitled to qualified immunity because it was not clearly established that use of that type of force in the circumstances of this case was unconstitutional. The court will grant defendants' motion and this case will be closed.

UNDISPUTED FACTS

The following facts are undisputed except where noted. The court will discuss additional facts as they become relevant to the analysis.

---

Wisconsin Statute § 803.03(2). Section 803.03(2) requires a plaintiff asserting a claim for affirmative relief to join all parties who have subrogation rights related to the plaintiff's claim. But "there is nothing in the Federal Rules of Civil Procedure that permits a plaintiff unilaterally to force another party to join his lawsuit as an involuntary plaintiff." *Doermer v. Oxford Fin. Grp., Ltd.*, 884 F.3d 643, 646 (7th Cir. 2018). Blue Cross has not appeared or participated in this case, so the court will dismiss it as a party in this case.

A. **Events preceding the use of force**

On the night of December 13, 2019, Frederick Jackson was visiting his wife.[2] The couple had separated, and Jackson was living elsewhere at the time. Jackson was drinking and became intoxicated during the visit, which prompted his wife to leave and take Jackson's keys with her. Around 7:35 pm, Jackson went to the next-door neighbor's house to ask for a ride. The neighbor, Tim Mitkos, said that he couldn't give Jackson a ride because he had guests over. Jackson left. Right after Jackson left, Mitkos heard a gunshot, and he called 911 to report it. Mitkos said that he didn't see Jackson with a gun but thought it was possible that the gunshot came from him. Mitkos said that a car had driven by around that time, so it was also possible that the shot came from the car rather than Jackson. Even though he hadn't seen a gun, Mitkos was sure that he had heard a gunshot.

Around 7:40 pm, Sergeant Javier Loredo and five other officers were dispatched to investigate the report of a gunshot. Loredo and the other officers parked their cars at the end of the street, a couple houses down from Jackson's house. As Loredo was getting out of his car, he heard what he believed were gunshots coming from the area of Jackson's house. Two of the other officers who had arrived on the scene also heard sounds that they thought were gunshots coming from the direction of Jackson's house. A third officer also heard a loud bang, but he thought it sounded like a hammer hitting an object, not a gunshot.

Loredo and the other officers approached Jackson's house, which had the garage door open with a car in the driveway. Loredo saw that there was a man in the driveway but could not identify him. Loredo saw that the man had something above his head as he walked from

---

[2] Jackson's wife owned the house where the events at issue in this case took place, but for simplicity, the court will refer to the house as Jackson's.

the driveway into the garage and heard two more gunshots, which Loredo interpreted as the man firing a gun above his head. Another officer who had approached the house also observed a man in the garage, heard shots, and thought it was the man in the garage firing a gun. Two other officers on the scene near the house also heard the noises and through they were gunshots. After hearing the gunshots, the officers observed that the man had closed the garage door.

Loredo directed officers on the scene to set up a perimeter around Jackson's house. He also requested SWAT officers, a crisis negotiator, and an armored vehicle. The crisis negotiator was at a command post at the police department and began working to gather information about Jackson. The crisis negotiator relayed to officers on the scene that Jackson had a previous weapons history and suffered from chronic alcoholism. One of the officers on the scene interviewed Mitkos, who repeated what he told the 911 operator: Jackson came to his house to ask for a ride, Mitkos said no, Jackson got upset and left, and then Mitkos heard a pop he thought was a gunshot (but he did not see a gun). Based on this information and what the officers had seen and heard when they arrived on the scene, the officers decided that there was probable cause to arrest Jackson for disorderly conduct while armed and recklessly endangering safety.

Once on-duty SWAT personnel and the armored vehicle arrived and were in position, the officers tried calling the house to tell Jackson to come out. When their phone calls received no response, the officers used the loudspeakers in the armored vehicle to give verbal announcements telling Jackson to come out, answer calls to his phone, or to call 911 to initiate a dialog. At some point when Jackson was in the house and officers were set up outside, a neighbor informed the officers that there were several firearms in Jackson's house. Jackson did not come out, and the situation was treated as a barricaded person incident, for which the full

SWAT team was called out. Officers Jacob Conrad, James Imoehl, Joseph Weberpal, Mitchell Witt, and Rene Gonzalez were all members of the SWAT team who responded to the full call out.

Several hours passed in which Jackson did not respond to instructions to come out or contact law enforcement. The officers could not see Jackson and did not know what he was doing in the house. At some point, the officers shot 40 millimeter rounds made of foam from baton launchers to break windows at back of the house and used a ram on the armored vehicle on the front door with the goal of making the announcements more clearly audible inside the house.

**B. Use of force**

Around 1:30 am, Jackson came into view of the officers at the front of the house. From this point on, there is video of the officers' interactions with Jackson from a body camera on the front of a ballistic shield held by Witt at the front of the group of officers, from Weberpal's body camera, and from Loredo's body camera.

Jackson came out from a hallway to the left of a short flight of stairs directly in line with the front door, wearing only boxer shorts. The officers were standing several feet behind the open front door. Conrad began talking to Jackson telling him to show his hands, come down the stairs and surrender to the officers. In response, Jackson stood at the top of the stairs, gesturing with his hands and yelling at the officers. Jackson asked what the officers were doing in his house and asked to see Officer Howard Payne, an officer with the Madison Police Department that Jackson knew. Conrad responded that Payne was off-duty and couldn't come to the scene right then. Then, Conrad repeated the instruction that Jackson should continue to show his hands, come downstairs, and surrender to the officers.

5

The officers could see that Jackson did not have anything in his hands. Loredo directed the officers to have 40 millimeter rounds ready and they moved closer to the door. Jackson was yelling and cursing at the officers, telling them to get out of his house and waving and pointing his hands at the officers.

As the officers moved in closer to the door, Gonzalez and Weberpal each fired 40 millimeter rounds at Jackson, hitting him in the front left shoulder and abdomen.[3] Jackson backed up toward the hallway after he was shot, bending over and screaming in pain. Conrad continued instructing Jackson to come down and show his hands after the shots, and Jackson again requested to speak to Payne. The officers responded that Payne wasn't there and that Jackson could talk to him once he came down and out the door.

As Conrad repeated his instructions for Jackson to come down and show his hands, Jackson slowly began to move out from the hallway and down the stairs. Jackson kept his hands in the air as he came out and descended the stairs, but continued to yell and curse at the officers and waive his hands as he did so. Dkt. 23-2 (Witt Body Camera 4:42–6:14). As Jackson got to the main level of the house, about eight to 10 feet from the door of the house, Jackson was looking and gesturing at one of the officers who was outside the kitchen window. Jackson took several steps toward the kitchen window and yelled, "shoot me, go ahead shoot me, just shoot me." *Id.* (Witt. Body Camera 5:38–55).

---

[3] The parties agree about the number of shots fired but disagree about what shots hit him. Jackson says that the first time Gonzalez and Weberpal fired, only one of the shots hit him and that they both fired a second time approximately three minutes later, causing two wounds to his abdomen. Jackson asserts that the video supports his version of events because no wound is visible on his abdomen when he descends the stairs. But Jackson's contention that the officers fired a total of four shots is contradicted by the body camera video, which shows that only one shot was fired when he was on the ground floor. Dkt. 23-2 (Witt. Body Camera 6:14–6:17); Dkt. 19-3 (Loredo Body Camera 5:54–5:59).

Conrad continued to yell instructions at Jackson, and Jackson turned to face the officers at the front door. Conrad first instructed Jackson to stop, get on his knees and turn away from the officers. In response, Jackson shouted, "I ain't giving you a goddamn thing." Dkt. 23-2 (Witt. Body Camera 5:54–6:00). Conrad then switched to instructing Jackson to turn around, while Gonzalez told him to get on his knees. Jackson did not turn around, but he was standing still and looked down at the wound on his shoulder. As he did so, Gonzalez shot him in the abdomen with another 40 millimeter round. When the third shot hit Jackson, he turned away from the officers, grabbing his abdomen and screaming in pain.

The officers rushed into the house and restrained Jackson. Conrad brought Jackson down to the ground from Jackson's right side. Witt held Jackson's left arm, restraining Jackson from his left side to help get handcuffs on him. Witt placed his left shin on Jackson's upper back as he restrained him. Imoehl also assisted in restraining Jackson by holding down Jackson's left foot to keep his leg on the ground.

Once Jackson was handcuffed, the officers led him out of the house where his three wounds were immediately treated by paramedics who were on the scene. He was then taken to a hospital for further treatment. Jackson had significant bruising across his abdomen and on his left shoulder, but he did not suffer permanent physical injuries from being shot with the 40 millimeter rounds.

ANALYSIS

Jackson asserts the following claims for violations of the Fourth Amendment: (1) defendants unlawfully entered the house without a warrant; (2) defendants unreasonably used baton launchers to break the windows of the house; (3) Weberpal and Gonzalez used excessive

force by shooting him with 40 millimeter rounds; (4) Loredo ordered the other defendants to use excessive force on Jackson; (5) defendants used excessive force when handcuffing Jackson; (5) defendants failed to intervene to stop the other officers from using excessive force; and (6) the City of Madison's unconstitutional policies and procedures, and failure to properly train, supervise, and discipline officers, caused the constitutional violations. Defendants move for summary judgment on each of those claims.

On a motion for summary judgment, the question is whether there are any genuine factual disputes that could make a difference to the outcome of the case, or, stated another way, whether a reasonable jury could find for the nonmoving party, after drawing all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). But in "rare circumstances when video footage clearly contradicts the nonmovant's claims, [courts] may consider that video footage without favoring the nonmovant." *Horton v. Pohjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 378–81 (2007)).

A. **Unlawful arrest**

Jackson contends that "any amount of force used against Jackson was excessive" because the officers did not have a legal right to enter the house to arrest him. Dkt. 45, at 5. Defendants contend that this is a new claim for unlawful arrest that wasn't pleaded in Jackson's complaint. Jackson's complaint does not contain a separate count of unlawful arrest. But the complaint does contain the following allegations concerning the officers' entry into the house:

> Any reasonably well-trained officer in the United States would know he cannot enter a person's home absent permission, a warrant, or exigent circumstances. At the time officers breached Jackson's home, hours after a complaint was made, with no sign

8

>of hostility from the home, and with a no-knock warrant authorizing officers only to search for things – not to arrest persons, officers broke almost every window in the home and shot Mr. Jackson three times with baton launchers despite his cooperation with Officer Conrad's commands, wearing only boxer underwear and with his visible hands held above him, and all officers aware Mr. Jackson had nothing in his hands, causing substantial injury to Mr. Jackson excessively and dangerously.

Dkt. 1, ¶ 52. To be sure, the complaint is awkwardly pleaded and does not explicitly say that the officers illegally entered Jackson's home. But the court need not decide whether Jackson fairly notified defendants of a claim for unlawful arrest because the court concludes that such a claim would fail on the merits. The officers reasonably believed that Jackson had been firing a gun in the garage in the middle of a residential area, which created exigent circumstances that justified entering Jackson's house.

"A warrantless entry into a residence to effect an arrest is presumptively unreasonable under the Fourth Amendment." *United States v. Walls*, 225 F.3d 858, 862 (7th Cir. 2000). Jackson does not dispute that the officers had probable cause to arrest him. Dkt. 49, ¶ 54. But Jackson contends that there is a factual dispute about whether the officers had a reasonable basis to believe that exigent circumstances justified their warrantless entry into his home. Jackson asserts that he did not fire any weapons that night, that the neighbor that made the initial 911 call did not report actually seeing a weapon, that evidence obtained later did not corroborate that Jackson fired a gun in the garage, and that he was acquitted on charges of being a felon in possession of a weapon stemming from his arrest that night.

But when assessing whether officers had an objectively reasonable basis for believing that exigent circumstances existed, courts consider the actual knowledge of the officers at the time of the warrantless entry. *United States v. Rivera*, 248 F.3d 677, 680–81 (7th Cir. 2001). Information acquired after the fact is not relevant to whether the officers had an objectively

9

reasonable basis to believe exigent circumstances justified warrantless entry. *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013).

None of the facts that Jackson cites create a genuine dispute over whether the officers had a reasonable belief that he had fired a weapon on the night of his arrest. The officers were called to the scene because Jackson's neighbor thought he heard a gunshot and had reason to believe it came from Jackson. The officers are entitled to rely on the neighbor's report that he thought Jackson fired a gun, even though the neighbor did not see Jackson with a gun. *United States v. Wooden*, 551 F.3d 647, 649 (7th Cir. 2008) ("the assertions of eyewitnesses to crime generally do not need corroboration, or a history of other accurate reports, to be believed."). And Jackson does not dispute that, once the officers were on the scene, Loredo and three other officers heard noises that they thought were gunshots coming from Jackson's house. Nor does Jackson dispute that Loredo and one of the other officers saw a male figure hold something above his head at the time they heard the shots and that the figure then went into the house and closed the garage door.

Jackson denies that he fired a weapon that night, pointing to his subsequent acquittal of a felon in possession charge from that night as evidence. But Jackson's assertion that he didn't fire a weapon does not contradict the officers' reports that they heard gunshots and saw what they thought was someone holding a gun go into the house. And on the night of December 13, the officers could not be aware of Jackson's subsequent acquittal of criminal charges related to that night or of the evidence developed for that case, so those facts are not relevant to the reasonableness of their conduct. *See Ochana v. Flores*, 347 F.3d 266, 272 (7th Cir. 2003). Because the officers were proceeding based on a reasonable belief that a person at Jackson's house had been firing a gun in a residential neighborhood, it was reasonable for them to fear

for the safety of that individual or anyone else in houses in the vicinity, which is an exigent circumstance that justified their entry into his house without a warrant to arrest him. *Fitzgerald*, 707 F.3d at 730.

**B. Property damage**

Jackson's complaint alleges that defendants violated the Fourth Amendment when they broke the windows in his home to have better means of communicating with him. (Jackson includes this allegation as part of his excessive force claim, but the proper characterization of the claim would be a Fourth Amendment claim for an unreasonable search.) Defendants move for summary judgment on this claim on the ground that none of the named defendants were personally involved in breaking the windows. In response, Jackson contends that Loredo is liable for breaking the windows, even if he did not do so himself, because he was the senior officer in charge of the scene. But Jackson does not dispute that the decision to break the windows came from officers at a nearby command post (not Loredo) and Jackson does not allege that any of the named defendants were responsible for carrying out that command, so the court will grant defendants' motion for summary judgment on Jackson's claim for property damage.

In his opposition brief, Jackson contends that the court should add the command post personnel responsible for ordering the destruction of the windows under Federal Rule of Civil Procedure 21, which governs misjoinder of parties. Dkt. 45, at 30. The court will deny Jackson's request. It would be highly prejudicial to defendants to allow Jackson to add new defendants at this point in the case. Jackson, who is represented by counsel, does not contend that defendants engaged in any type of discovery misconduct that would have prevented him from learning about the role of the command post officers or about defendants' argument

11

concerning lack of personal involvement earlier in the case. The time to add defendants has long since passed.

**C. Use of force**

Jackson contends that Weberpal and Gonzalez used excessive force when, at Loredo's direction, they shot him with 40 millimeter rounds, and that defendants Conrad, Witt, Imoehl, and Weberpal used excessive force when they took him to the ground and handcuffed him after he had been shot. Defendants contend that the force used on Jackson was reasonable under the circumstances and that, even if the amount of force used on Jackson was not objectively reasonable, they are entitled to qualified immunity because it was not clearly established that use of force in the circumstances of this case violated the Fourth Amendment.

The basic question for an excessive force claim under the Fourth Amendment is whether the officer used "greater force than was reasonably necessary." *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016). Courts assess the amount of force used from the perspective of a reasonable officer in light of the totality of the circumstances known to the officer, without regard to the officer's actual intent or his subjective beliefs. *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 472–73 (7th Cir. 2015). In assessing reasonableness, relevant factors include the seriousness and immediacy of any threat posed by the plaintiff, the severity of any suspected crime, and the extent of the plaintiff's resistance or interference with an officer's duties. *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015). In cases where all material facts are undisputed, "reasonableness is a pure question of law" for the court. *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020).

Qualified immunity shields government officials who make good-faith mistakes in the performance of their duties. Qualified immunity protects government officials from individual

liability under 42 U.S.C. § 1983 unless two elements are met: (1) the official violated a federal statutory or constitutional right, and (2) the unlawfulness of the official's conduct was clearly established at the time of the violation. *Bradley v. Vill. Of Univ. Park, Illinois*, 59 F.4th 887, 904 (7th Cir. 2023) (citing *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)). Courts may consider these two prongs in either order. *Est. of Escobedo v. Bender*, 600 F.3d 770, 779 (7th Cir. 2010). For the unlawfulness of a defendant's conduct to be clearly established, a reasonable officer in the defendant's shoes would need to understand that he was violating the plaintiff's right. *Doxtator v. O'Brien*, 39 F.4th 852, 863 (7th Cir. 2022). The use of excessive force is an area of the law "in which the result depends very much on the facts of each case"; police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). "This sounds like a high bar because it is—qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Doxtator*, 39 F.4th at 863 (citation and quotation marks omitted).

1. **Weberpal and Gonzalez's use of 40 millimeter rounds**

The type of force that Weberpal and Gonzalez used on Jackson—40 millimeter rounds fired from a baton launcher—is "at least on the high-end of the spectrum of less-lethal force." *Phillips v. Community Ins. Corp.*, 678 F.3d 513, 521–22 (7th Cir. 2012). The Seventh Circuit has held that "the law is clearly established that police officers cannot use 'significant' force on suspects who are only passively resisting arrest." *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014). But the use of significant force that inflicts pain and blunt trauma is reasonable if a person is actively resisting arrest, which can include physically lashing out at officers or "declining to follow instructions while acting in a belligerent manner." *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018). The use of significant force is also reasonable in situations

13

where a person poses a threat to the officers or others on the scene. *Bell v. Irwin*, 321 F.3d 637, 639–40 (7th Cir. 2003); *see also Shirley v. Rabensteine*, No. 22-2147, 2023 WL 129432, at *2 (7th Cir. Jan. 9, 2023) (holding that use of bean bag rounds and Tasers on a person was reasonable even though he said "I give up" because he "had actively resisted arrest for hours by car, by foot, and by hiding," "was suddenly dropping onto [officers] from the ceiling," and might have been armed).

In response to Weberpal and Gonzalez's assertion of qualified immunity, Jackson has the burden of showing that a reasonable officer would understand that shooting Jackson with 40 millimeter rounds violated his right to be free of excessive force. *Cibulka v. City of Madison*, 992 F.3d 633, 640 (7th Cir. 2021) (citing *Marshall v. Allen*, 984 F.2d 787, 797 (7th Cir. 1993)). To meet this burden, Jackson must either "(1) identify a closely analogous case that established a right to be free from the type of force the police officers used on him, or (2) show that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Cibulka*, 992 F.3d at 639 (citation, alterations, and internal quotation marks omitted). Jackson does not argue that the force used in this case was so plainly excessive that the defendants knew that it was unconstitutional. So Jackson must identify a binding, closely analogous case that clearly establishes the unconstitutionality of the force used here.

Jackson's arguments on qualified immunity are sparse; he focuses on his contention that disputed questions of fact preclude finding that the defendants' conduct was reasonable as a matter of law. *See* Dkt. 45, at 33–37. Specifically, Jackson contends that there are factual disputes about (1) whether reasonable officers could perceive him as a threat and (2) whether he was complying with officers' commands when Gonzalez and Weberpal shot him. Jackson

contends that if the disputed facts are resolved in his favor, then he was compliant or only passively resisting, in which case precedent involving the use of force on passively resisting individuals could be analogous to his case.

But there is no material factual dispute that reasonable officers could perceive Jackson as a threat. The defendant officers were aware that Jackson had firearms in the house. They had probable cause to arrest him for firing a weapon earlier that night, and Jackson had been ignoring commands to come out for approximately five hours when he finally began interacting with them, at which point he was repeatedly shouting at officers that he wouldn't comply with commands. Indeed, the video shows that, from his first appearance, Jackson was yelling and cursing at officers and moving his arms in a way that could reasonably be interpreted as angry and indicate that he was intoxicated.

Whether Jackson was complying with the officer's commands when he was shot is a closer call, especially for the third shot that hit Jackson when he was standing on the ground floor. At that point, Jackson had come down the stairs in compliance with the officers commands, and, when he was hit, he was standing with his empty hands at his sides receiving what seemed to be conflicting instructions about what the officers wanted him to do. But even if there was a factual dispute about whether Jackson was complying with commands at the time of the third shot, Jackson has not identified an analogous case that establishes a reasonable officer would know that shooting him with 40 millimeter rounds under the circumstances of this case would violate the Fourth Amendment.

Jackson's conduct distinguishes this case from *Phillips v. Community Insurance Corporation*, 678 F.3d 513 (7th Cir. 2012), the case that Jackson relies on to show that if he was passively resisting then "it was clearly established in 2019 that [the force used on Jackson] was excessive." Dkt. 45, at 14. [4] In *Phillips*, officers repeatedly shot a woman with less lethal bullets from a baton launcher when she did not respond to directions to come out of her car. She was suspected of driving while intoxicated in a stolen car and was lying in the front seat of the car with her head toward the center of the car and her legs sticking out the driver's side door, with her feet on the ground. The Seventh Circuit held that it was objectively unreasonable for the officers to shoot her with the baton launcher four times, rejecting the officers' argument that she posed a threat because she was in a running car that could be used as a weapon. *Phillips*, 678 F.3d at 526. In the position the woman was in, she could not have suddenly driven the car toward the officers, and she made no attempt to respond to police or flee after the first shot. Simply put, the situation in *Phillips* was "not the kind of 'tense, uncertain, and rapidly evolving' situation that required 'split-second' judgment calls." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)).

In contrast to the plaintiff in *Phillips*, Jackson was on his feet and moving around in a house where the officers reasonably believed there were firearms, and he had been yelling and cursing at officers to say that he was not going to comply with their instructions. Even though Jackson did not have a weapon when Gonzalez and Weberpal shot him, Jackson is a large man

---

[4] Jackson cites several non-binding cases to illustrate the general principle that violent force is unreasonable when used against a compliant or passively resisting subject who does not pose a danger to others. These cases might be useful points of comparison in determining the reasonableness of the force used here. But none are binding authority with closely analogous facts that show a clearly established right under the qualified immunity analysis.

who at several points suddenly started yelling at the officers moments after he appeared calm. Jackson's erratic behavior posed a threat to officers in a tense and potentially volatile situation. Maybe the officers could have taken Jackson into custody without the use of force if they had waited longer for him to comply with commands. But the Fourth Amendment does not require officers to use the least restrictive means to take a person into custody if the amount of force used is reasonable in the totality of the circumstances. *Stabenow v. City of Eau Claire*, 546 F. Supp. 3d 787, 797 (W.D. Wis. 2021). The court concludes that defendants are entitled to qualified immunity on Jackson's claim that Weberpal and Gonzalez used excessive force when they shot him with 40 millimeter rounds.

The court also concludes that Loredo is entitled to qualified immunity on Jackson's claim that Loredo violated his Fourth Amendment rights by ordering Weberpal and Gonzalez to use the 40 millimeter rounds. Because Jackson has not shown that it was clearly established that the force used was unreasonable, Loredo is also entitled to qualified immunity for directing the other officers.

### 2. Conrad, Witt, Imoehl, and Weberpal's use of force while handcuffing Jackson

Jackson also contends that Conrad, Witt, Imoehl, and Weberpal used excessive force when they handcuffed him. Jackson supports this contention with his assertion that the officers pulled his limbs in different directions and that Witt's kneeling on his back prevented him from breathing. Dkt. 50, ¶ 94. But the video evidence contradicts Jackson's assertion that the officers were pulling and twisting his limbs in different directions. *See* Dkt. 21-2 (Weberpal Body Camera 5:58–6:29); Dkt. 19-3 (Loredo Body Camera 6:55–7:40). It is clear from the video that Imoehl is merely holding Jackson's leg in place and that Witt and Conrad moved

17

Jackson's arms to be handcuffed without unduly pulling them back or twisting his wrists. It is well established that "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion" to make the arrest. *Graham*, 490 U.S. at 396. The court concludes that the undisputed facts show that the defendants acted reasonably when they used a minimal degree of force to bring Jackson to the ground and handcuff him.

### D. Failure to intervene

Jackson contends that the individual defendants failed to intervene to stop Weberpal and Gonzalez from using excessive force when they shot him.[5] To hold defendants liable for a failing to intervene to stop other officers from using excessive force, Jackson needs to show that the defendant knew that the other officer was violating the plaintiff's constitutional rights and that the defendant had a "realistic opportunity" to prevent the violation. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). "A realistic opportunity means a chance to warn the officer using excessive force to stop." *Miller*, 761 F.3d at 826 (internal quotation marks omitted).

For the reasons explained above, a reasonable officer could believe that Weberpal and Gonzalez's use of the non-lethal ammunition was reasonable under the totality of the circumstances. So Jackson cannot show the first element of his failure to intervene claims. The court concludes that defendants are entitled to summary judgment on these claims.

### E. Monell claim

Jackson brings a *Monell* claim against the City of Madison, seeking to hold it liable for failing to ensure that its officers act lawfully when using force. The City is liable for

---

[5] Jackson's complaint does not specify which use of force he alleges the defendants should have intervened to stop. But in his opposition brief Jackson limits his discussion of this claim to the use of the 40 millimeter rounds, so he has forfeited any failure-to-intervene claims based on the officers' use of force while handcuffing him.

unconstitutional acts of its officers only if the constitutional violation resulted from a City policy, widespread practice, or decision by a City policymaker. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978). Jackson contends that the City has a pattern of failing to discipline officers for the unlawful use of force on nonthreatening suspects that amounts to a policy of deliberate indifference to citizens' Fourth Amendment rights.

Jackson does not identify prior cases where the City failed to address officers' excessive use of force, either for the officers who are defendants in this case or for other officers in the city. Jackson contends that a jury could decide that the City's failure to discipline Loredo, Gonzalez, or Weberpal demonstrates "that there is a widespread custom within the City that condones the use of excessive force." Dkt. 45, at 40. But "a plaintiff cannot establish a § 1983 claim against a municipality by simply alleging that the municipality failed to investigate an incident or to take punitive action against the alleged wrongdoer." *Baskin v. City of Des Plaines*, 138 F.3d 701, 705 (7th Cir. 1998); *see also Stabenow*, 546 F. Supp. 3d at 803. The court concludes that the City is entitled to summary judgment on Jackson's *Monell* claim.

ORDER

IT IS ORDERED that defendants' motion for summary judgment, Dkt. 18, is GRANTED. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered May 31, 2024.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge